**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **SMILEDIRECTCLUB, LLC,** | UNDERLYING LITIGATION: |
| Petitioner, | CASE NO. 3:19-CV-00845 |
| vs. | U.S. DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
| **AMERICAN DENTAL ASSOCIATION,** | CASE NO. |
| Respondent. | **MEMORANDUM IN SUPORT OF MOTION TO ENFORCE** |

**I.     INTRODUCTION**

Petitioner SmileDirectClub, LLC ("Petitioner" or "SDC") seeks to enforce a Rule 45 subpoena *duces tecum* served on Respondent, the American Dental Association ("ADA") that seeks documents relevant to the plaintiffs' claims and SDC's defenses in a nationwide class action lawsuit pending in the United States District Court for the Middle District of Tennessee, *Ciccio v. SmileDirectClub, LLC, et al.,* Case No. 3:19-845 (Trauger, J.).  As set forth below, the subpoena seeks documents that go to the heart of SDC's defenses to claims asserted against it by a group of disgruntled orthodontists, many of whom are members of the ADA, who claim that, but for allegedly "false" statements made by SDC about its competing brand of clear aligners, these orthodontists would have recruited new patients and made more money selling their competing products.

On March 29, 2021, SDC served the ADA with a third-party subpoena containing fifteen document requests.  (**Exhibit A.**)  On April 13, 2021, the ADA's counsel responded to the subpoena, but instead of producing any documents, they asserted a collection of rote objections. (**Exhibit B.**)  SDC and the ADA met and conferred on April 27, 2021.  (*See* Declaration of David

A. Rammelt ("Rammelt Decl.") at ¶ 6). During that call, the ADA refused to produce any responsive documents, and it has repeatedly argued that SDC's requests are not relevant to the *Ciccio* case. (*Id.* at ¶ 7). The ADA reiterated as much in a May 4, 2021 letter, in which it reaffirmed its refusal to run any search for documents—not even merely to determine the volume of documents potentially responsive to SDC's requests—and further refused to identify any potential custodians for a search of responsive documents. (**Exhibit C.**) Despite SDC's exhaustive explanations as to how its document requests to the ADA are relevant, and despite SDC's offer to assist with search terms and potentially share in the cost incurred in responding to the subpoena, to date the ADA still has not agreed to even run searches for responsive documents, let alone produce them. (*Id.*; *see also* **Exhibit D**). Accordingly, SDC brings this motion to compel the ADA to produce documents in response to its subpoena.

## II.    LEGAL STANDARD

The Federal Rules of Civil Procedure allow parties to "obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Fed. R. Civ. P. 26(b).

The analysis of whether a document request in a Rule 45 subpoena is relevant is no different than the relevance analysis under Rule 26. *SPS Techs., LLC v. Boeing Co.*, 2019 WL 2409601, at *3 (N.D. Ill. June 7, 2019) (citing Advisory Committee Notes to 1991 Amendments to Rule 45(a)(2) ("[A] 'non-party witness is subject to the same scope of discovery under this rule as that person would be as a party to whom a request is addressed pursuant to Rule 34.'")).

"Relevancy, for purposes of discovery, is defined broadly . . . ." *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 679-80 (N.D. Cal. 2006); *see also Coleman v. Illinois*, 2020 WL 5752149, at *3 (N.D. Ill Sept. 25, 2020) ("In the discovery context, '[b]ecause the purpose of discovery is to help define and clarify the issues, relevance is to be construed broadly.'") (quoting *Doe v. Loyola Univ.*

*Chi.*, 2020 WL 406771, at *2 (N.D. Ill. Jan. 24, 2020)). Indeed, as this Court has observed, "[a] district court whose only connection with a case is supervision of discovery ancillary to an action in another district should be 'especially hesitant to pass judgment on what constitutes relevant evidence thereunder.'" *Elm Energy & Recycling (U.K.) Ltd. v. Basic*, 1996 WL 596456, at *11 (N.D. Ill. Oct. 9, 1996) (quoting *Truswal Sys. Corp. v. Hydro–Air Eng'g, Inc.*, 813 F.2d 1207, 1210 (Fed. Cir. 1987)).

In the case of a subpoena served on a third party, consideration is given to the burden and expense that may be required of a non-party. "Thus, in determining whether the recipient of a subpoena is being subjected to undue burden, courts consider a number of factors, including the person's status as a non-party, the relevance of the discovery sought, the subpoenaing party's need for the documents, the breadth of the request and the burden imposed on the subpoenaed party." *Parker v. Four Seasons Hotels, Ltd.*, 291 F.R.D. 181, 188 (N.D. Ill. 2013).

A nonparty may be compelled to produce documents. Fed. R. Civ. P. 34(c) (citing Fed. R. Civ. P. 45). The nonparty may object to the serving party's request but, "[a]t any time, on notice to the [nonparty], the serving party may move the court for the district where compliance is required for an order compelling production or inspection." Fed. R. Civ. P. 45(d)(2)(B)(i). The serving party must show the requested documents are relevant to its claims or defenses and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). Reasonably accessible electronically-stored documents must be produced, while non-reasonably accessible electronically-stored information need not be produced immediately, but may need to be produced later if good cause is shown. *See* Advisory Committee Note to 2006 Amendment to Fed. R. Civ. P. 26(b)(2).

An objecting nonparty must show the information requested is not reasonably accessible

due to undue burden or cost. Fed. R. Civ. P. 26(b)(2)(B); *see also* Fed. R. Civ. P. 45(d)(1), (d)(3)(A)(iv); *Breuder v. Bd. of Trs. of Cmty. Coll. Dist. No. 502*, 2020 WL 4676666, at *4 (N.D. Ill. Aug. 12, 2020) ("As the subpoena respondent, it is [the objecting nonparty's] burden to show undue burden or expense."). Even if this burden is met, the court may nonetheless order discovery if the requesting party shows good cause within the limitations of Rule 26(b)(2)(C).

### III. ARGUMENT

#### A. Background: The Underlying Lawsuit & the ADA's Involvement

In order to understand the relevance of SDC's document requests, some background about its business and the ADA's involvement is helpful. SDC is a Dental Services Organization ("DSO") that is similar in many respects to traditional brick-and-mortar DSOs.[1] Founded in 2014, SDC is a pioneer—and a disruptor—in the field of traditional orthodontia by being the first to offer doctor-directed, remote clear aligner treatment to address mild to moderate malocclusions. SDC uses its innovative teledentistry DSO platform that relies on a network of more than 250 affiliated state-licensed dentists and orthodontists. SDC's clear aligner treatment requires no in-person office visit—which is especially important in rural and Native American communities because many households in the United States do not have a single orthodontist in their counties—and is priced at about one-third of the cost of competing clear aligners. The cost differential alone allows SDC to increase consumer access to care.

---

[1] DSOs provide nonclinical administrative services to dental practices that are 100% owned and controlled by licensed dentists. They are specifically in charge of the practice's management and operations, while the licensed dentists conduct the actual doctor/patient interaction and care. *See* Brian Colao & Meredith Tavallaee, *The DSO Model Offers Advantages to Dentists*, DENTISTRY TODAY (Oct. 15, 2019), https://www.dentistrytoday.com/news/todays-dental-news/item/5486-the-dso-model-offers-advantages-to-dentists. Examples include Heartland Dental (with over 750 practices) and Aspen Dental (with over 600 practices).

SDC's business model—providing easier access to more affordable dental care—inherently conflicts with the financial interest of many ADA members, who typically rely on in-person visits to offer a variety of services (teeth cleanings, cavities, etc.) that typically are more expensive. Not surprisingly, the ADA has launched an aggressive media campaign that is critical of SDC's model and compares it to "Do-it-Yourself" dentistry. In fact, on April 25, 2019, the ADA went so far as to file a Citizen's Petition with the FDA, accusing SDC of, among other things, illegally selling aligners without FDA clearance. (**Exhibit E.**) In addition to these claims, the ADA emphasized the lack of an in-person office visit and examination as falling below the "standard of care" in the dental industry. Less than six weeks after the ADA filed its petition, the FDA rejected it on May 30, 2019. (**Exhibit F**.)

Undeterred from its failed effort to sway the FDA, the ADA then wrote a letter to the FTC, urging the agency to investigate SDC for allegedly making false and misleading claims. (**Exhibit G**.) In its letter, the ADA took aim at SDC's level of care it provides for its customers, as well as SDC's use of teledentistry to facilitate connecting its customers with state-licensed orthodontists. As with the FDA, the FTC has not pressed forward with any of the requests made by the ADA.

**B. <u>SDC's Narrowly Tailored Requests are Directly Relevant to the Allegations in the Underlying Class Action Lawsuit</u>**

The underlying class action giving rise to this motion was filed on September 24, 2019, in the U.S. District Court for the Middle District of Tennessee. (*See* current Amended Complaint, **Exhibit H**.) Three orthodontists allege that SDC made false statements about its treatment model and that these orthodontists were damaged as a result. Front and center to their complaint are allegations that largely repeat the charges leveled by the ADA.

Although the entire underlying Amended Complaint is attached, a summary of some of the key allegations is necessary to view SDC's discovery requests, and hence relevance, in context. Among other things, the orthodontists allege:

> SmileDirect is a company under siege. It is currently subject to a barrage of litigation and customer complaints that challenge its business model and set forth substantiated allegations that SmileDirect is operating illegally in violation of provisions of the federal Food, Drug, and Cosmetic Act (the "FD&C Act"). (Am. Compl. ¶ 1).
>
> More specifically, SmileDirect is currently subject to: (a) At least 40 state claims filed by the relevant state affiliate of the American Dental Association ("ADA"), American Association of Orthodontists ("AAO"), or similar organizations alleging, in a substantiated fashion, that SmileDirect is illegally operating as a dentist without proper licensing in the subject state. Indeed, a Federal District Court in Georgia recently found that SmileDirect was in fact illegally operating as a dentist in connection with its ordinary course practices. (*Id.* at ¶ 2(a)).
>
> A complaint filed by the ADA with the Federal Trade Commission ("FTC") requesting that the FTC investigate numerous false and misleading claims made by SmileDirect to fraudulently entice customers to purchase its products and services. The ADA's detailed lengthy complaint alleges that SmileDirect has made false and misleading claims and engages in unfair and deceptive practices within the meaning of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. (*Id.* at ¶ 2(c)).
>
> Rather than address and seek to remedy these substantiated complaints alleging illegal operation, false advertising, and violations of the FTCA and the FD&C Act, SmileDirect instead has taken the low road by (a) refusing to make refunds to customers who have had bona fide problems with the aligners and/or damage relating to their teeth and (b) bringing litigation against ADA or AAO state affiliates and their board members to deflect the claims contained in their state-filed complaints with respect to SmileDirect's illegal operation. (*Id.* at ¶ 3).
>
> A lengthy, detailed and substantiated Citizen Petition filed by the American Dental Association with the federal Food and Drug Administration ("FDA") alleging in a detailed and substantiated fashion that SmileDirect is in continuing violation of the FD&C Act because it is selling plastic aligners that it manufactures in Tennessee (a) without a valid prescription and (b) without having had such aligners approved pursuant to a 510(k) clearance procedure. (*Id.* at ¶ 2(b)).
>
> SmileDirect's omni-channel marketing campaign uses literal falsities and misleading statements, as described herein, and is designed to demean the traditional orthodontic industry, which SmileDirect describes, in its Prospectus, as "competition." Many of those false, misleading, and demeaning statements are contained in the dozens of online commercials compiled by iSpot.tv, including the following:

- Stating that "we can straighten your smile for 60% less than braces;"
- Stating that, "[i]f your aligners aren't a good fit for you, you get your money back;"
- Stating that "you shouldn't have to wear braces to get your smile;"
- Asking "why would anyone go to a dentist's office?;"
- Describing braces as including "embarrassing wires."

These false, misleading, and demeaning statements harm dentists practicing traditional orthodontics and mislead consumers who would otherwise purchase traditional orthodontic services. (*Id.* at ¶ 77).

In fact, patients do not interact with "treating doctors," either in person, by telephone, or through the SmileDirect internet platform. No doctor is ever identified to the customer as being their treating doctor, and communications between customers and SmileDirect take place through administrative personnel not trained in orthodontics or dentistry. This internet-based administrative interaction is nothing like the seamless communication between a treating doctor and the patient advertised by SmileDirect or employed in traditional orthodontics. Indeed, the SmileDirect "patient" does not even know who the purported dentist is. (*Id.* at ¶ 83).

It is beyond dispute that SmileDirect's version of "teledentistry" is not consistent with the applicable medical standard of care for traditional dentists. Its false marketing injures both consumers and competing dentists. (*Id.* at ¶ 86).

"Had I had the opportunity to do this over again, ***I would have coughed up the extra dough and done it the right way with Invisalign***. The quality of the tray simply weren't [sic] up to par. I was convinced that they sent me the wrong trays in later months because I wasn't seeing any incremental movement or straightening." (*Id.* at ¶ 119).

On or about April 25, 2019, the American Dental Association filed a detailed 20-page Citizen Petition with the FDA outlining why SmileDirect's self-manufactured and self-distributed aligner practice violates the FD&C Act. The FDA is currently addressing these issues. On October 10, 2019, the ADA confirmed that "[a]ll substantive issues raised by the ADA's citizen petition remain fully before the FDA at this time." (*Id.* at ¶ 121).

Both of these nondisclosures are highly material and highly fraudulent because consumers would be reluctant to use SmileDirect's aligners in any capacity if they knew that they were being sold in violation of both federal and state law. (*Id.* at ¶ 124).

As a manufacturer of its aligners, SmileDirect was legally obligated to seek FDA clearance for such product, likely pursuant to Rule 510(k). SmileDirect instead has decided to flout these legal requirements and is selling its product, which should be labeled and sold only by prescription, in an essentially over-the-counter fashion. (*Id.* at ¶ 129).

Against this backdrop, SDC served the ADA with fifteen document requests that are not only relevant, but that are narrowly tailored and go directly to issues that are critical to the orthodontists' claims and SDC's defenses in this case. Importantly, the plaintiff orthodontists' complaint specifically relies on statements made by the ADA and actions taken by the ADA. (*See, e.g.*, Am. Compl. at ¶ 2(a–c) (noting that SDC is currently defending against: "claims filed by the relevant state affiliate of the American Dental Association . . . alleging, in a substantiated fashion, that SmileDirect is illegally operating as a dentist without proper licensing in the subject state;" "[a] lengthy, detailed and substantiated Citizen Petition filed by the American Dental Association . . . alleging in a detailed and substantiated fashion that SmileDirect is in continuing violation of the FD&C Act;" and "[a] complaint filed by the ADA with the Federal Trade Commission requesting that the FTC investigate numerous false and misleading claims made by SmileDirect."); *Id.* at ¶ 89 ("The ADA has a policy with respect to teledentistry that establishes the industry standard . . . SmileDirect plainly does not meet the industry standard for teledentistry in several respects."); *Id.* at ¶ 121 ("On October 10, 2019, the American Dental Association confirmed that '[a]ll substantive issues raised by the ADA's citizen petition remain fully before the FDA at this time.'")). Even where the Amended Complaint does not expressly mention the ADA, the subject matter of the allegations directly aligns with public statements by the ADA, including those in the Citizen's Petition to the FDA and its letter to the FTC. Thus, communications and documents related to those allegations directly implicate the truth or falsity of the statements made by SDC. Put another way, whether the ADA's conclusions about SDC were correct or incorrect has a direct bearing on SDC's defenses in the underlying litigation.

More particularly, these requests are directly relevant to the claims and defenses in the underlying lawsuit for many reasons, the most obvious of which are:

*First*, whether or not the plaintiff orthodontists themselves have benefited from, and SDC harmed by, efforts by the ADA, to disparage SDC and its business model is directly relevant. (**Exhibit A**, Req. Nos. 1, 2 &9).

*Second*, whether SDC at all times had 510(k) clearance and whether it violated any FDA regulation or sold aligners in violation of the Food, Drug & Cosmetic Act is directly at issue in the *Ciccio* case, and thus all documents in the possession of the ADA that relate to these issues is relevant. (*Id.* at Req. No. 4).

*Third*, whether the ADA had any involvement whatsoever with complaints made against SDC to various state dental boards is directly relevant. (*Id.* at Req. Nos. 6, 7, 8, 9, & 10).

*Fourth*, whether SDC's model is safe and effective, and whether the ADA is aware of any clinical or scientific study or research that relates to the safety or efficacy of SDC's treatment program, or that compares SDC to ADA-approved clear aligners, or that supports or refutes the various statements made by the ADA is directly relevant. (*Id.* at Req. Nos. 13 & 14)

*Fifth*, the ADA's communications with the FTC and FDA and participation in complaints against SDC to these government agencies is directly relevant. (*Id.* at Req. No. 5).

*Sixth*, whether the ADA or its attorneys have been in communication with the plaintiff orthodontists or their attorneys regarding SDC or the lawsuit is undeniably relevant. (*Id.* at Req. No. 12).

*Seventh*, whether the ADA's marketing materials and other member communications make representations about SDC or its products or services that either disparaged SDC or benefitted the plaintiff orthodontists and their practices is directly relevant. (*Id.* at Req. No. 11).

*Eighth*, these documents are relevant to whether the plaintiff orthodontists have been damaged.

***Ninth***, these documents are relevant to whether the plaintiff orthodontists' associations with the ADA affects their ability to serve as adequate class representatives.

***Tenth***, these documents are relevant to whether, given the ADA's statements, SDC's products and services are safe, effective, and/or legal.

***Eleventh***, these documents are relevant to whether an in-person examination or office visit is necessary to meet the "standard of care," whatever that standard is.

***Twelfth***, these documents are relevant to whether SDC's products and services are comparable to those of Align Technology, which the plaintiff orthodontists sell without complaint or criticism to their patients.

***Thirteenth***, any documents, communication. or information the ADA relied upon or otherwise discovered in connection with its Citizen Petition to the FDA is directly relevant. (*Id.* at Req. Nos. 9 & 10).

***Fourteenth***, in the months leading up to the filing of the *Ciccio* lawsuit, the ADA made more than a dozen public statements in newsletters, emails, website postings, presentations, and national advertising critical of SDC and its teledentistry model, and SDC needs all documents in the possession of the ADA that relate to the statements (not just the statements themselves, but all of the underlying information relating to those statements) in order to refuted the parroting allegations made by the plaintiffs.

In fact, the relevance of SDC's targeted document requests cannot seriously be disputed under the governing law of this Court. In *SPS Technologies, LLC v. Boeing Co.*, this Court ruled on a motion to enforce a Rule 45 subpoena on a nonparty. 2019 WL 2409601 (N.D. Ill. June 7, 2019). The petitioner was the plaintiff in a trade-secret-misappropriation claim, and Boeing was a customer of both entities. *Id.* at *2. Boeing objected to the subpoena as irrelevant, and it argued

that document searches for the petitioner's name should be qualified by including the name of the defendant in the underlying litigation. *Id.* at *4. This Court disagreed, finding that Boeing's suggested limitation "runs too great of a risk that relevant documents will be excluded from production." *Id.* The Court also noted that documents showing how Boeing and other manufacturers treated the petitioner's product was "highly relevant to the existence of a trade secret, an essential element" of the petitioner's claims in the underlying litigation. *Id.*

### C. The ADA Cannot Show Undue Burden or Expense

Although SDC was willing to work with counsel for the ADA to find a principled, meaningful compromise if there was truly a burden or undue expense, the ADA's counsel made this impossible by not conducting any search for documents prior to serving its objections or prior to engaging in a meet-and-confer. Although it is SDC's position that the ADA's conduct estops it from now complaining about undue burden or expense, the practical result is that this Court's mandate for good faith meet-and-confer to avoid burdening this Court with discovery disputes is rendered moot when one party complaints about "burden" without having made any effort at all to actually find out if it has responsive documents, if they are relevant, where the documents are located, how voluminous the documents are, whether they can be collected and produced with minimal effort, what the cost would be, or whether anything is actually privileged. The ADA did not do any of these things, but it has instead refused to do anything claiming that everything is irrelevant.

## IV. <u>CONCLUSION</u>

For all of the foregoing reasons, SDC respectfully requests that this Court: (1) strike all of the ADA's objections for violating its duty of good faith in responding to a federal subpoena; (2) order the ADA to produce all of the requested documents within 30 days at the ADA's own expense; and (3) award SDC the costs and attorneys' fees incurred in connection with this motion and such other relief as the Court deems just and equitable.

Dated: June 11, 2021

Respectfully submitted,

*/s/ David A. Rammelt* _____
David A. Rammelt
Benesch, Friedlander, Coplan & Aronoff LLP
71 S. Wacker Drive, Suite 1600
Chicago, IL  60606
Telephone:  (312) 212-4949
Email:  drammelt@beneschlaw.com

*Attorney for Petitioner SmileDirectClub, LLC*